## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

### AT CLARKSBURG

**WEST VIRGINIA UNIVERSITY
BOARD OF GOVERNORS** for and on behalf of
**WEST VIRGINIA UNIVERSITY**,

    Plaintiff,

v.                                          Civil Action No. 1:08-CV-00041
                                           (Hon. John P. Bailey, District Judge)

**RICHARD RODRIGUEZ**,

    Defendant and Third Party Plaintiff,

v.

**WEST VIRGINIA UNIVERSITY
FOUNDATION, INC.**, a West Virginia corporation,

    Third Party Defendant.

### **DEFENDANT'S RESPONSE TO MOTION TO REMAND**

    Defendant, by counsel, hereby responds to the Motion to Remand of Plaintiff West Virginia University Board of Governors for and on behalf of West Virginia University ("Board").

    Defendant was the head football coach at West Virginia University during the Fall Semester of 2007. In mid-December 2007, Defendant announced his intention to resign his position and take new employment at the University of Michigan. Remarkably, a mere eight (8) days following his formal resignation, the instant lawsuit for declaratory judgment was filed, nominally by the Board. Curiously, the members of the Board never met or voted to authorize the instant lawsuit before it was filed, instead apparently relying on some extra-legal authority they have announced to the media as

being based upon some past pattern and practice.[1]

In its hastily prepared and premature Complaint,[2] Plaintiff admitted that it was "a resident of the State of West Virginia." Complaint at paragraphs 1 and 3. Defendant removed this case to this Court on January 16, 2008, asserting this Court's diversity jurisdiction, relying on Plaintiff's admission that it is a West Virginia resident, and Defendant's obvious Michigan residency since he resigned his position in West Virginia, accepted a new job in Michigan, and took numerous actions

---

[1] In an Associated press story dated February 1, 2008, Board "Chairman Steve Goodwin said the board, which is named as a plaintiff, 'was intimately involved in the decision.' A meeting was not required because of long-standing practice established under former President David C. Hardesty Jr., he said. The president is permitted to act on the board's behalf in initiating or defending lawsuits. 'An actual vote on this was not necessary,' Goodwin said." *See* http://sports.espn.go.com/espn/wire?section=ncf&id=3226411. These statements may clash with the Board's own "Operating Procedures," that state:

> "**1.11 Collective Authority and Action**
>
> The authority of the Governors is conferred upon them as a Board, and they can bind the Board and the University only by acting together through a majority vote of the Board as described in these operating procedures and applicable law.
>
> Except as noted herein, permitted by act of the Board or otherwise provided by law, **no individual member may commit the Board to any policy, declaration, directive or action without prior approval of the Board**."

(emphasis added).

[2] The lawyers who represent the Board in this matter are private attorneys, not lawyers regularly employed by the State of West Virginia. According to one published report, there was no agreement between the private lawyers and Board as to how the lawyers will be compensated at least as of January 11, 2008, two weeks after the case was filed. January 11, 2008, *West Virginia Record*, http://www.wvrecord.com/news/206118-wvu-suspects-rodriguez-told-recruits-he-was-leaving (WVU Vice President Alexander "Macia said he doesn't know how the university will compensate Flaherty and Fitzsimmon [*sic*]. 'That is something we haven't gotten into yet,' he said.").

showing an intent to reside in Michigan by the time of the filing of this lawsuit, including: (1) accepting employment and establishing an office in Michigan, (2) signing a lease for a place to live in Michigan, (3) obtaining a Michigan driver's licence and (4) registering to vote in Michigan.[3]

**I      STANDARD**

Diversity jurisdiction exists because "[t]he Constitution has presumed (whether rightly or wrongly we do not inquire) that state attachments, state prejudices, state jealousies, and state interests, might sometimes obstruct, or control, or be supposed to obstruct or control, the regular administration of justice." *Martin v. Hunter's Lessee*, 14 U.S. 304, 347 (1816). "The purpose of this jurisdictional grant was to avoid discrimination against nonresidents." *Szantay v. Beech Aircraft Corp.*, 349 F.2d 60, 65 (4th Cir. 1965).

On a motion to remand, the removing party (Defendant) bears the burden of proof in establishing jurisdiction. *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). It is agreed that federal courts construe the removal statute narrowly, resolving doubts against removal. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). On the other hand, addressing a federal court's diversity jurisdiction, "It is well-established federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them,'" *Gum v. General Elec. Co.,* 5 F.Supp.2d 412, 415 (S.D.W.Va.1998) (citation omitted).

It is equally well-established, that the record and time for establishing jurisdiction is confined

---

[3] Considering how quickly and prematurely Plaintiff filed the lawsuit, without communication with Defendant and before any breach of contract occurred, one could speculate that Plaintiff, who obviously knew Defendant intended to move to Michigan as soon as he accepted the position there, was hoping to get its Complaint on file for the very purpose of creating an argument against diversity. As shown below, if that was Plaintiff's intent, it did not succeed.

to the time removal occurs. *Beasley v. Personal Fin. Corp.* 279 B.R. 523, 532 (S.D. Miss. 2002) ("It is a well established principal of removal jurisdiction that grounds for removal are determined at the time of removal.") (citing *Walker v. FDIC*, 970 F.2d 114, 120 (5th Cir. 1992); *McCoy v. Erie Ins. Co.*, 147 F.Supp. 2d 481, 489 (S.D.W.Va. 2001) ("In addressing the propriety of federal jurisdiction in a removal action, courts base their decision on the record existing at the time the petition for removal was filed.") (citation omitted).

**II      ARGUMENT**

Plaintiff makes two arguments in support of remand. First, it now argues it is not a citizen of the State of West Virginia. Second, it argues Defendant is a citizen of the State of West Virginia. Since filing the motion, Plaintiff has implicitly admitted it did not have sufficient information to make the latter assertion by seeking "jurisdictional discovery." As shown below, jurisdictional discovery of Defendant's citizenship is unnecessary because the record is clear and Plaintiff's assertions thereon were in error. As also shown below, in its Motion to Remand, Plaintiff mis-states the inquiry required to determine whether an entity like West Virginia University and its Athletic Department are alter egos of the State. As stated by the Court of Appeals for the Fourth Circuit, "[T]he question of whether an entity is an alter ego of the state is **a highly fact-intensive undertaking**[.]" (emphasis added). *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 257 (4th Cir. 2005). Because Plaintiff has moved to remand without either addressing the proper jurisdictional test, nor offering sufficient facts to support its position under the correct test, the Court easily could find against Plaintiff on that basis alone. Alternatively, however, jurisdictional discovery on that issue may be necessary, including concerning Plaintiff's financial ties to the private West Virginia University Foundation, Inc., to develop the record for the Court to determine whether

Plaintiff is in fact an alter ego of the state for diversity purposes.

### A      PLAINTIFF IS A CITIZEN OF THE STATE OF WEST VIRGINIA

In its Complaint instituting this action on December 27, 2007, Plaintiff pled that is "a resident of the State of West Virginia." Complaint at paragraphs 1 and 3. Based in part on that representation of residency, Defendant removed this action to this Court on January 16, 2008. After removal, Plaintiff amended its Complaint, now alleging it is a resident of West Virginia, but not a citizen of West Virginia. Amended Complaint at ¶ 1 (deleting the sentence from the original Complaint that stated, "The West Virginia University Board of Governors is a resident of the State of West Virginia[]" and inserting instead the following new assertion: "While the University resides in the State of West Virginia, as the alter ego of the State, it is not a citizen for the purposes of diversity jurisdiction.").

The new post-removal assertion is of little use to Plaintiff here, however, because the Court must look to the record at the time of removal, not thereafter.[4] As stated in *Linville v. Price,* 572 F.Supp. 345, 347 (S.D.W.Va.1983):

> "For diversity jurisdiction purposes citizenship is equated with domicile. *Webb v. Nolan,* 361 F.Supp. 418 (M.D.N.C.1972), *aff'd per curiam,* 484 F.2d 1049 (4th Cir.1973), *appeal dismissed* 415 U.S. 903, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974); *Jardine v. Intehar,* 213 F.Supp. 598 (S.D.W.Va.1963). And citizenship is determined as of the date the suit is instituted. *Kaiser v.*

---

[4] The only claim made by the Plaintiff in its December 27, 2007 Complaint was one for a declaratory judgment. The Amended Complaint, filed after removal, added a claim for breach of contract, but the Complaint as filed and at the time of removal is the standard by which diversity jurisdiction is examined. In that regard, it is significant that the Supreme Court of Appeals of West Virginia differentiates declaratory judgment actions and has held that, "suits for declaratory judgment have been held not to be suits against the State," *Pittsburgh Elevator Co. v. West Virginia Bd. of Regents*, 172 W.Va. 743, 753, 310 S.E.2d 675, 686 (1983).

*Loomis,* 391 F.2d 1007 (6th Cir.1968); *Webb v. Nolan, supra.*"[5]

Therefore, based on the Complaint as it was pled at the time this suit was instituted, as well as at the time of removal, Plaintiff was a resident of the State of West Virginia. It is true, however, that residence is not necessarily synonymous with domicile, although there can be no doubt that if West Virginia University and its Athletic Department have a domicile, it is within the State of West Virginia.

Plaintiff's primary argument on remand (and as expressed belatedly after removal in its Amended Complaint), is that West Virginia University is "an arm of the State" and "is a [*sic*] not a citizen for purposes of diversity citizenship." Plaintiff's Memorandum at 3. While acknowledging federal law is used to determine citizenship, in a strikingly sparse argument, Plaintiff relies on a decision from the Court of Appeals for Sixth Circuit to contradictorily assert, without any explanation, that "whether the University is a citizen of West Virginia or an alter ego of West Virginia for purposes of diversity jurisdiction *is governed by the law of West Virginia.*" Plaintiff's Memorandum at 4 (emphasis added). Revealingly, Plaintiff does not even attempt to argue that, if federal law is applied, that it is not a citizen of West Virginia for diversity jurisdiction purposes.[6]

---

[5] *See Kessler v. Home Life Ins. Co.,* 965 F.Supp. 11, 12 (D.Md.1997):

> "Ordinarily, the existence of subject matter jurisdiction based on diversity of citizenship is determined as of the filing of, and on the face of, the complaint in an original action, *see O'Brien v. Jansen,* 903 F.Supp. 903, 905 (D.Md.1995), and, in addition, at the time of the removal in an action filed in state court. *United Food Local 919 v. CenterMark Properties,* 30 F.3d 298, 301 (2d Cir.1994)."

[6] This is not to suggest state law plays *no* role in determining the issue, but rather it clearly is not the only element examined to make the determination, as Plaintiff incorrectly suggests. In *Long v. Sasser,* 91 F.3d 645, 647 (4th Cir. 1996) the Court of Appeals stated, "The

There are many instances where an entity created by a state legislature have been deemed to be a citizen of a state for diversity purposes. *See, e.g., Guaranty Trust Co. v. West Virginia Turnpike Comm'n*, 109 F.Supp. 286, 293 (S.D.W.Va. 1952) (state turnpike commission is a West Virginia citizen for diversity purposes); *Univ. of Rhode Island v. A. W. Chesterton Co.*, 2 F.3d 1200, 1217 (1st Cir. 1993) (state university system is a Rhode Island citizen); *Kirby Lumber v. Louisiana*, 293 F.2d 82, 83-84 (5th Cir. 1961) (state game and fish commission is a Louisiana citizen); *Dept. of Highways v. Morse Bros. & Assocs.*, 211 F.2d 140, 144-45 (5th Cir. 1954) (state department of highways is a Louisiana citizen); *Univ. System of New Hampshire*, 756 F.Supp. 640, 647 (state university system is a New Hampshire citizen); *Morrison-Knudsen Co. v. Massachusetts Bay Transp. Auth.*, 573 F.Supp. 698, 705 (D. Idaho 1983) (Massachusetts Bay Transportation Authority is a Massachusetts citizen).

In this Circuit, federal law determines whether a state agency is considered an alter ego of the State for the purposes of diversity jurisdiction. The Court of Appeals for the Fourth Circuit recently in *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 260-61 (4th Cir. 2005) held that:

> "In determining if a public entity is an alter ego of the state, and therefore not a "citizen" under § 1332, courts have generally looked to the standards announced in cases addressing whether governmental entities are entitled to Eleventh Amendment immunity as an arm of the state. *See, e.g., Univ. of S. Ala. v. Am. Tobacco Co.,* 168 F.3d 405, 412 (11th Cir.1999); *Univ. of R.I. v. A.W. Chesterton Co.,* 2 F.3d 1200, 1202 n. 4, 1203 (1st Cir.1993)."

(footnote omitted).

---

question of citizenship for purposes of diversity jurisdiction is ultimately one of federal law, *Ziady v. Curley,* 396 F.2d 873, 874 (4th Cir.1968), although federal courts may consult state law in making a decision, *Rodriguez-Diaz v. Sierra-Martinez,* 853 F.2d 1027, 1030 (1st Cir.1988)."

In contrast to Plaintiff's assertion that "the law of West Virginia" alone determines whether a government entity is an "arm of the State," the Fourth Circuit follows a four part test:

> "Typically, we apply a four factor test, first announced in *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456 (4th Cir.1987), to determine whether a governmental entity is an "arm of the state" under the Eleventh Amendment. Accordingly, we will apply the same multi-factored test in this case to determine if the University is an alter ego of the state and therefore not a "citizen" under § 1332."

*Maryland Stadium Authority, supra,* 407 F.3d at 261.

The Court of Appeals went on to explain the applicable four part test as follows:

> "[I]n determining an entity's status as an arm of the state, "the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." [ . . .]. After resolving this inquiry, we examine three other factors, "includ[ing], but ... not necessarily limited to, whether the entity exercises a significant degree of autonomy from the state, whether it is involved with local versus statewide concerns, and how it is treated as a matter of state law." *Ram Ditta,* 822 F.2d at 457-58 (footnotes omitted)[.]"

*Id.*[7] The Court of Appeals explained the second and fourth parts of the test as follows:

> "We analyze the second *Ram Ditta* factor, the operational autonomy of the entity, by considering whether the state retains a veto over the entity's actions, the origins of the entity's funding, and who appoints the entity's directors. *See*

---

[7] The Court of Appeals made a distinction in the importance of the "state treasury" factor under the Eleventh Amendment as opposed to its lesser weight in determining an entity's status under § 1332:

> "In the context of reviewing the status of an entity under § 1332, this concern with protecting the state treasury is not as relevant. Accordingly, we will apply, in cases addressing whether an entity is an alter ego of the state for purposes of diversity jurisdiction, the original *Ram Ditta* standard. Thus, in contrast to cases involving an entity's entitlement to Eleventh Amendment immunity, the effect of the action on the state treasury will not be controlling."

*Maryland Stadium Authority, supra,* 407 F.3d at 262, n. 11.

> *Ristow v. S.C. Ports Auth.,* 58 F.3d 1051, 1052 (4th Cir.1995). As to the fourth factor, although "[a] state court's view of the status of a state political entity is, of course, an important factor, ... questions of eleventh amendment immunity are ultimately governed by federal law." *Ram Ditta,* 822 F.2d at 459-60. These factors elucidate whether the "relationship between the governmental entity and the State [is] sufficiently close to make the entity an arm of the State." *Cash,* 242 F.3d at 224.

*Id.,* 407 F.3d at 261-62.[8]

In the *Maryland Stadium Authority* case, an important factor was where any monetary recovery by the State would go. *Id.*, 407 F.3d at 264 ("[A]ny monetary recovery by the University would be reported to the Comptroller. The amount of the recovery would then be set off against any appropriations for the next fiscal year, resulting in a direct benefit to the state-the outlay of less appropriations to the University."). By contrast, in the most similar circumstance involving Plaintiff and its Athletic Department, the "buy-out" owed by Plaintiff's former basketball coach under his employment contract with Plaintiff actually is being paid, not to the University, but to Third party defendant West Virginia University Foundation, Inc.[9] Additionally, it appears the obligations

---

[8] While the four part test stated in *Maryland Stadium Authority, supra*, is not discussed at all in Plaintiff's Motion to Remand, Defendant acknowledges the Court of Appeals for Fourth Circuit generally surveyed other cases where an argument was raised that a particular state university was or was not an arm of the state for diversity purposes, and found the precedent "overwhelming" holding most universities to be arms of the state. Nevertheless, the Court of Appeals held that, "[d]espite this overwhelming precedent, 'each state university must be evaluated in light of its unique characteristics.' *A.W. Chesterton,* 2 F.3d at 1204." *Maryland Stadium Authority, supra*, 407 F.3d at 263. Thus, only by examining West Virginia University and its Athletic Department and football program, and the important financial role played by the West Virginia University Foundation, Inc. under the four part test, can a definitive and complete determination to the instant question be had. *See* Part II.B., *infra*.

[9] *Charleston Gazette,* May 3, 2007, 2007 WLNR 8425419 ("West Virginia University's athletic department accepted a lesser payout than that called for in the contract of former basketball coach John Beilein. This past Thursday, WVU and Beilein announced the new Michigan coach would pay $1.5 million **to the WVU Foundation instead of $2.5 million as directed in the contract**.") (emphasis added).

seemingly owed by the University under the employment contract at issue herein actually were to be paid by the Foundation, not the University.[10] Thus, in these unique and rather unusual circumstances, the actual and past arrangements between the Plaintiff's Athletic Department and its football program with the Foundation, are such that in regard to the employment contract in issue, the Plaintiff should not be considered an alter ego of the State.

Another fact deemed important to the Court of Appeals in *Maryland Stadium Authority* was that the University of Maryland in that case was represented by the state Attorney General. *Id.*, 407 F.3d 264-65. In West Virginia, the law is clear that the state *Constitution* requires that when a state entity engages in litigation, the Attorney General must appear on the pleadings as counsel. *Syllabus Point 7, in part, State ex rel. McGraw v. Burton,* 212 W.Va. 23, 569 S.E.2d 99 (2002) ("In all instances when an executive branch or related State entity is represented by counsel before a tribunal, the Attorney General shall appear upon the pleadings as an attorney of record[.]").[11] In this case, the Plaintiff has chosen to proceed without the Attorney General appearing as counsel of record.[12]

---

[10] *See generally 4-H Road Community Ass'n v. West Virginia University Foundation, Inc.*, 182 W.Va. 434, 435, 388 S.E.2d 308, 309 (1989) (Foundation support for the University is extensive).

[11] In *West Virginia ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W.Va. 2002), the court recognized that the Attorney General possesses certain "core functions" that the legislature may not limit. *Id.* at 107.

[12] In this regard, the fact that the Board did not vote to authorize this suit before it was filed, and the President of the University initiated this lawsuit based upon some past pattern and practice, *see* note 1, *supra*, also supports the conclusion that the Plaintiff should not be considered to be acting as an 'arm of the State." Also significant is the fact that President and the faculties may make "rules and regulations . . . for the general government of the university" subject only to approval by the Board, not the legislature. *W.Va. Code* § 18-11-5.

Certainly Plaintiff may, if it is not a state entity, have private counsel.[13] But if Plaintiff wants to take the position in this litigation that it is a state entity for the purposes of diversity jurisdiction, then it should have followed state law. The failure to include the Attorney General as counsel, as required by state law, strongly suggests in this case that Plaintiff should be deemed to be acting as a citizen of the State of West Virginia, and not an arm of the State.

The Court in the *Maryland Stadium Authority* case also addressed the operational autonomy of the entity by considering whether the state retains a veto over the entity's actions, the origins of the entity's funding, and who appoints the entity's directors. In this case, the State does not have a veto over actions of the Plaintiff.[14] As for the origins of the Plaintiff's funding, obviously it receives funding through tuition and fees collected, and in the circumstances of the Athletic Department, to whom it appears to have delegated authority to enter into the contract at issue, substantial funding also comes from the West Virginia University Foundation, Inc., such that the Athletic Department in general, and the Plaintiff's football program in particular is "self-sufficient."[15]

The circumstances in the case at bar are more akin to the case of *University of Rhode island v. A.W. Chesterton Co.*, 2 F.3d 1200 (1st Cir. 1993), where the Court of Appeals for the First Circuit held that the University of Rhode Island was a citizen of Rhode Island, rather than an arm or alter

---

[13] A state entity also may have private counsel in addition to the Attorney General, but nevertheless must have the Attorney General as counsel.

[14] While it is clear the State does not have a veto over the actions of the Plaintiff, it is true also that twelve (12) of the eighteen (18) members of the Board are appointed by the Governor.

[15] The *Times West Virginian,* January 27, 2008, http://www.timeswv.com/wvu_sports/local_story_027004648.html (Discussing Plaintiff's Athletic Director Ed Pastilong discussion of "his self-sufficient department's operating budget has skyrocketed from about $12 million annually to in the area of $40 million.").

ego of the state, for purposes of diversity jurisdiction.[16] For example, the *Maryland Stadium Authority* court explained that some of the dispositive factors that supported the finding in the *University of Rhode Island* case was that the University of Rhode Island held full legal title to property and could enter into contracts without limitation. *Id.*, 407 F.3d at 265. Likewise, it is the Plaintiff, and not the State, in whom title to all the University's property is vested. *W.Va. Code* § 18-11-1a.[17] The Board is a corporation. It also has the same power of a corporation, on its own, "to contract and be contracted with[.]" *W.Va. Code* § 18-11-1.[18] It has the power to be sue, and also may be sued. *Id.* It may plead, and it may be impleaded. *Id.* In addition, it is Plaintiff, and not the State, who specifically must "fix the salaries of the president of the university, athletic director, head

---

[16] "With sufficient autonomy from the state, especially with regard to financial matters, an agency, political subdivision, or state university is the real party in interest and is thus a 'citizen' for the purposes of diversity jurisdiction." *Univ. System of New Hampshire v. United States Gypsum Co.*, 756 F.Supp. 640, 645 (D.N.H. 1991).

[17] In *obiter dicta* statements made in *City of Morgantown v. Ducker,* 153 W.Va. 121, 168 S.E.2d 298 (1969), a case where a proceeding for mandamus was brought to compel judges of Court of Claims to assume jurisdiction of claim against Board of Governors of West Virginia University, the Supreme Court of Appeals held that, "the board holds such property in trust for the State and not as a separate or independent corporate entity."

[18] It is unclear whether Plaintiff takes the position that there are limitations on its power to contract. Certainly state law imposes some restrictions on state agencies right to contract, such as limiting state contracts to one year's appropriations. *W.Va. Code* 12-3-17. Under state law, approval as to the form of the contract by the Attorney General is required, as is filing with the State Auditor if the length of the contract exceeds six months, but from the copies of the contract and amendments attached to the Amended Complaint, Plaintiff does not appear to have complied with those restrictions in this case. (**§ 5A-3-13. Contracts to be approved as to form; filing**: Contracts shall be approved as to form by the attorney general. A contract that requires more than six months for its fulfillment shall be filed with the state auditor.")

football coach and all assistant football coaches at said university." *W.Va. Code* § 18-11-20.[19] On a matter deemed important in *Maryland Stadium Authority, supra*, unlike the University of Maryland, West Virginia University even has the power to issue revenue bonds without legislative approval. *W.Va. Code* § 18-11A-1.[20] The Board has the power to enter into "an agreement with any trust company, either within or outside the State, as trustee for the holders of bonds[,]" and "[a]ny such agreement entered into by the board shall be binding in all respects *on such board and its successors*[.]" *W.Va. Code* § 18-11A-4 (emphasis added). In fact, perhaps more importantly, when the Board so acts and issues revenue bonds, only the credit of Plaintiff, and not the credit of the State, is being pledged. *W.Va. Code* § 18-11A-6 ("No provisions of this article shall be construed to authorize the board at any time or in any manner to pledge the credit or taxing power of the State, nor shall any of the obligations or debts created by the board under the authority herein granted be deemed obligations of the State.").[21]

As for the third and fourth factors under the *Maryland Stadium Authority/Ram Ditta* test, Defendant does not dispute that, like the University of Maryland, West Virginia University is engaged in educating the youth of West Virginia, and that such education is a state concern and a

---

[19] Although the statute calls for the Board, not the State, to fix the salary of the head football coach, the contract and amendments thereto at issue in this case, attached to the Complaint and the Amended Complaint, are not signed by any member of the Board of Governors, but rather by Athletic Director Ed Pastilong. An examination of the minutes of the Board found online do not reveal any action taken by the Board in regard to the Second Amendment to the employment contract.

[20] However, the Governor must sign the bonds.

[21] *See also W.Va. Code* § 18-11B-10.

traditional governmental function.²² Nevertheless, as shown above, under state law, at least in regard to substantial obligations and liabilities of Plaintiff for revenue bonds it issues, it is not treated as an alter ego of the State under State law.²³ Additionally, state law treats declaratory judgment claims different for the purpose of determining whether a claim is made against a state entity. As noted above, the Supreme Court of Appeals has differentiated declaratory judgment actions and has held that, "suits for declaratory judgment have been held not to be suits against the State," *Pittsburgh*

---

²² Historically, perhaps important to the instant analysis under federal law, state courts on the one hand assert Plaintiff is "an arm of the state" but on the other hand admit Plaintiff exercises "wide discretion as to the expenditure of money" received for athletics:

> "By legislative fiat, Code, 18-11-1, as amended by Chapter 73, Acts of the Legislature, 1947, and Section 1-a, Chapter 89, Acts of the Legislature, 1947, the board of governors of West Virginia University is a public and governmental body and as such is an arm of the State, vested with a wide discretion as to the expenditure of money derived under the provisions of Section 2, Article 1-a, Chapter 83, Acts of the Legislature, Regular Session, 1943, and deposited in the state treasury in the 'State Special Athletic Receipts Fund.'"

*Syllabus* Point 2, *State ex rel. Board of Governors of W. Va. University v. Sims,* 134 W.Va. 428, 59 S.E.2d 705 (1950).

²³ Even where state entities have received significant state appropriations, courts have held that the entities are autonomous, and not alter egos of the state. *See, e.g., Univ. of Rhode Island*, 2 F.3d at 1215 ("[M]ere receipt of state appropriations is not conclusive evidence of the recipient's 'alter ego' status. Many (if not most) political subdivisions routinely receive significant state appropriations, but are characterized as autonomous entities for immunity and diversity purposes."); *Mt. Healthy City Bd. of Education v. Doyle*, 429 U.S. 274, 280 (1977) (board of education that received significant state funding not an alter ego); *Kovats v. Rugers*, 822 F.2d 1303, 1308 (3d Cir. 1987) (state university not an arm of the state despite state appropriations of 50-70% of its general operating account); *Univ. System of New Hampshire*, 756 F.Supp. at 646 (state university system that received 25% of its expenses paid for by the state not an alter ego); *Morrison-Knudsen*, 573 F.Supp. at 702 (state transportation authority not an arm of the State, even though the State paid a "relatively large percentage of the Authority's financial budget"); *Fitchik*, 873 F.2d at 661 ("Although New Jersey might appropriate funds to [the state entity] to meet any shortfall caused by judgments against [the state entity], such voluntary payments by a state do not trigger sovereign immunity.").

*Elevator Co. v. West Virginia Bd. of Regents*, 172 W.Va. 743, 753, 310 S.E.2d 675, 686 (1983).[24]

### B     JURISDICTIONAL DISCOVERY

It must be noted again that Plaintiff did not invoke or address the proper *Maryland Stadium Authority/Ram Ditta* standard in its Motion for Remand. Therefore, it is possible that Plaintiff will attempt to correct its error in its reply brief and address the correct standard and perhaps raise factual issues that were not set forth in its Motion or supporting memoranda. Ordinarily, raising arguments for the first time in a reply brief should be disallowed because it prevents the opposing party from making a response to the moving party's bases for its motion, which of course is the purpose of a response brief. However, in this Circuit, "the question of whether an entity is an alter ego of the state is a highly fact-intensive undertaking[.]" *Maryland Stadium Authority, supra*, 407 F.3d at 257. Therefore, if the Court chooses to allow Plaintiff to address the proper standard for the first time in its reply brief, Defendant moves the Court to allow factual jurisdictional discovery of Plaintiff and Third Party Defendant in order to make a complete record to satisfy the "highly fact-intensive undertaking" of determining whether Plaintiff is an alter ego of the State in this case.

### C     COACH RODRIGUEZ WAS A CITIZEN OF THE STATE OF MICHIGAN WHEN THIS LAWSUIT WAS COMMENCED

Diversity jurisdiction is also present because Coach Rodriguez was a citizen of the State of Michigan at the time this action was commenced – December 27, 2007. The party asserting diversity jurisdiction bears the burden of proof. *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986). Because

---

[24] While the Complaint in the case at bar states a claim for declaratory judgment filed by an entity claiming to be a state agency, and not stating a claim against it, there is no logical reason for this rule to not apply to a claim for declaratory judgments brought by a putative state agency.

Coach Rodriguez was domiciled in and a citizen of West Virginia just shortly before this action was commenced, the Defendant must prove by clear and convincing evidence that he changed his domicile to the State of Michigan prior to the commencement of this action. *See generally*, *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 696 F.Supp. 37, 40-41 (SDNY 1988) (citations omitted), 28 U.S.C. § 1332(a)(1).

For purposes of diversity jurisdiction, the terms "citizenship" and "domicile" are synonymous. *Yeldell v. Tutt,* 913 F.2d 533, 537 (8th Cir. 1990). The law is well established that a person is not necessarily a citizen of, or domiciled in, the state in which he resides at any given moment. *McDonald v. Equitable Life Insurance Co. of Iowa*, 13 F.Supp.2d 1279, 1280 (N.D. Ala. 1998); *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S.Ct. 1597, 1608 (1989). Instead, "citizenship" or "domicile" is determined by two (2) elements:

- (1) Physical presence within a state; and
- (2) The mental intent to make a home there indefinitely. *McDonald v. Equitable Life Insurance Co.,* at 1281; *Mississippi Band of Choctaw Indians*, 490 U.S. at 48, 109 S.Ct. at 1608.

A citizen can change his domicile instantly by taking up residence at a new domicile with the intent to remain there indefinitely. *See, Bateman v. E.I. Dupont DeNemours & Co.*, 7 F.Supp.2d 910, 911 (E.D. Mich. 1998) (internal citation omitted). An individual's statements of intent are also to be considered in determining domicile. *See, McDonald v. Equitable Life Insurance Co.*, at 1281.

To ascertain intent, a Court must examine the entire course of a person's conduct in order to draw the necessary inferences as to the relevant intent. *See Balch, Halsey, Stuart, Inc. v. Namm*, 446 F.Supp. 692, 694 (SDNY 1978). Furthermore, a Court must look not only at a person's intent

to be in a state at a certain time, but rather at his intent to stay there for an unspecified or indefinite period of time. See, *Townsend, Rabinowitz, Pantaleoni & Valente, P.C. v. Holland Industries, Inc.*, 109 F.R.D. 671, 672 citing *Prakash v. American University*, 727 F.2d 1174, 1180 (D.C. Cir. 1984).

Here, the factual record unequivocally establishes that Coach Rodriguez was a citizen of the State of Michigan when this lawsuit was commenced. First, on December 16, 2007, Coach Rodriguez publicly announced that he was leaving West Virginia University, and had accepted the head coaching position at the University of Michigan. On December 19, 2007 Coach formally submitted a letter of resignation to West Virginia University.

Approximately one week later, on December 26, 2007, the day **before** this suit was filed, the Coach and his wife were physically present in the State of Michigan, and executed a residential lease agreement for a townhouse in Ann Arbor, Michigan. (Redacted copy attached hereto as "Exhibit A").[25] On December 27, 2007 while Plaintiff was filing this case in the State of West Virginia, Coach Rodriguez and his wife had registered to vote in the State of Michigan (redacted copy attached hereto as "Exhibit B"), and also obtained a State of Michigan driver's license (redacted copy attached hereto as "Exhibit C").

Accordingly, on the day this action was filed by Plaintiff, Coach Rodriguez's Michigan citizenship is established by the following:

(1) Physical presence in the State of Michigan;
(2) Acceptance of the head coaching position at the University of Michigan, including establishment of a business office on the campus

---

[25] Given the public interest in this dispute, and the animosity of West Virginia residents against Defendant, redacted copies of the Coach's Lease Agreement, Voting Registration, and driver's license are attached hereto in an effort to keep some portions of the Coach's personal information out of the public domain. Plaintiff has filed a Motion for Jurisdictional Discovery, and unredacted copies of these materials will be made available to Plaintiff's counsel upon execution of an appropriate protective order.

of the University of Michigan;

(3) Establishment of a residence in Ann Arbor, Michigan;

(4) Registering to vote in the State of Michigan; and

(5) Obtaining a driver's license in the State of Michigan.

Thus, on the day this lawsuit was filed Coach Rodriguez was physically present in the State of Michigan and had the intent to make Michigan his home indefinitely. In short, Michigan is where Coach Rodriguez was hanging his hat when this lawsuit was filed.

When the Coach returned to the State of West Virginia on December 29, 2007 he was served with a copy of Plaintiff's Complaint. However, the question that must be asked is whether at that point in time the Coach had an intention to stay indefinitely in the State of West Virginia, or Michigan. Clearly, the Coach considered the State of Michigan his home at this point in time.

Plaintiff makes much of the fact that the Coach sent a supplemental resignation letter via Federal Express on January 10, 2008 which listed his West Virginia residence as the return address. However, this letter was sent from Ann Arbor, Michigan as evidenced by the Federal Express tracking record. (Copy attached as "Exhibit D"). The Coach listed the return address as his West Virginia address simply to avoid having his current Michigan address in the public domain given the public animosity, threats against him and his family, and property damage already done to his West Virginia residence.

## III  CONCLUSION

For all of the foregoing reasons, the Motion to Remand and for costs should be denied.[26] Alternatively, if in its reply Plaintiff raises new factual issues not addressed in its Motion to Remand and supporting Memoranda, Defendant moves the Court to allow jurisdictional discovery of Plaintiff and Third Party Defendant.

**RICHARD RODRIGUEZ**
---------By Counsel----------


/s Sean P. McGinley

Sean P. McGinley, Esq. (WV Bar No. 5836)

**DITRAPANO BARRETT & DIPIERO PLLC**

604 Virginia Street East

Charleston, WV 25301

Phone:  304-342-0133

Fax:      304-342-4605

---

[26] As far as Plaintiff's request for costs are concerned, costs can not be awarded if the motion to remand is denied.  Moreover, to the extent the basis for the request for costs relies on an assertion that a motion to remand in *West Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co.,* 354 F.Supp.2d 660 (S.D.W.Va.2005) was made "on the same basis as the University in this case," that assertion is in error, as the issues involved were different and the ruling did not involve an "alter ego" analysis ("In any event, the court need not reach the alter ego analysis in light of its conclusion that the state is the real party in interest.") *West Virginia ex rel. McGraw, supra,* 354 F.Supp.2d 660 at 674 n.11.  Curiously, while Plaintiff in its Motion mentioned the participation of the undersigned local counsel as counsel in that case, it for some reason omitted acknowledgment that the law firm representing it here, Flaherty, Sensabaugh & Bonasso, also was co-counsel for one of the defendants in that case, and that no costs were awarded even though the motion to remand was granted in that case.

Marvin A. Robon, Esq. (OH/0000644)

R. Ethan Davis, Esq. (OH/0073861)

**BARKAN & ROBON LTD.**

1701 Woodlands Drive, Suite 100

Maumee, OH 43537

Phone: (419) 897-6500

Fax:    (419) 897-6200

    Co-counsel for Defendant